IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | Case No. 2:08-cv-00243 CW |
| v. | Judge Clark Waddoups |
| MADISON REAL ESTATE GROUP, LLC, et al., | |
| Defendants. | |

This matter is before the court on motions to lift stay filed by Interveners Fannie Mae, Midland Loan Services, Inc. ("Midland") and Crown NorthCorp, Inc. ("Crown NorthCorp") (collectively the "Interveners") so they may foreclose on properties held in a receivership and pursue deficiency judgments. The Securities and Exchange Commission ("SEC") alleges that defendants were involved in a Ponzi scheme. According to the allegations, defendants encouraged individuals to invest in real property owned by Madison Real Estate Group ("Madison"). To carry out the scheme, Madison formed limited partnerships, in which it made itself the general partner. The investors then acquired an ownership interest in one or more of the limited partnerships based on the amount of their investment. The limited partnerships would then purchase the real property from Madison. Often these purchases occurred immediately after Madison acquired the property in what is termed a "double closing." Despite the immediacy of the sale, unbeknownst to the investors, Madison often sold the property to the limited partnerships for a much higher price than it purchased the property.

The investors were told they would be paid a return from the profits generated by their respective properties. The investors subsequently learned, however, that defendants were not making mortgage payments on the properties, that the properties were not in the condition represented, and that defendants were commingling funds between the respective properties.

On March 28, 2008, the SEC filed a Complaint against defendants. On that same date, three orders were entered staying the commencement of any action against the properties held by defendants,[1] freezing the assets of defendants and the limited partnerships,[2] and appointing Roger J. McConkie as receiver to marshal and take control of any funds, assets, and property.[3] The Interveners contend they are secured creditors who hold notes or service loans that are secured by the properties held in the Receivership. They further contend the properties are depreciating in value and they are being harmed. Consequently, they ask the court to lift the stay so they can pursue their legal remedies against the properties.

## ANALYSIS

## I.    APPLICABLE LAW

A court has the power to grant and continue "stays to prevent interference with the receivership estate."[4] To preclude other individuals from proceeding with their case in another forum, however, one must "make a strong showing" that a receivership is "necessary and that the

---

[1]  Docket No. 7.

[2]  Docket No. 8.

[3]  Docket No. 10.

[4]  *Commodity Futures Trading Com. v. Chilcott Portfolio Mgmt.*, 713 F.2d 1477, 1483 (10th Cir. 1983).

disadvantageous effect on others would be clearly outweighed."[5]  Indeed, "[a] receivership is only

a means to reach some legitimate end sought through the exercise of the power of a court of equity.

It is not an end in itself."[6]  Consequently, a receivership must be monitored to ensure it is still serving

the function for which it was created.[7]  In the case of *Securities & Exchange Commission v. Wencke*,

the court set forth three factors that are relevant here in determining whether the stay should be lifted

for certain properties in this Receivership.  First, the court should determine whether the stay

preserves the status quo or whether the Interveners "will suffer substantial injury if not permitted to

proceed."[8]  Second, the court should look at the timing of the motion to lift stay to ensure the

Receiver has had sufficient time to organize and understand the assets under his control.[9]  Finally,

the court should determine whether the Interveners' claims have merit.[10]

## II.   RELINQUISHED   PROPERTIES   OR   PROPERTIES   THAT   WILL   BE   RELINQUISHED.

### A.     Wellington and Tree House Apartments

During the course of the Receivership, the Receiver has relinquished certain properties that

have no equity or benefit to the Receivership.  In particular, the Receiver has relinquished the

_____

[5]  *Id.* at 1484.

[6]  *Kelleam v. Maryland Cas. Co.*, 312 U.S. 377, 381 (1941) (quoting *Gordon v. Washington*, 295 U.S. 30, 37 (1935)).

[7]  *See id.* (citing *Michigan v. Michigan Trust Co.*, 286 U.S. 334, 345 (1932)).

[8]  *Sec. & Exch. Comm'n v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984).

[9]  *Id.*

[10]  *Id.*

Wellington and Tree House properties.[11]  The orders granting relinquishment allow Midland to initiate foreclosure proceedings, as long as it does not pursue a deficiency against the investors.[12] Accordingly, the Receiver contends that Midland's motions are now moot and should be denied. In reply, Midland asserts it is claiming a deficiency against the Receivership because it has not been permitted to pursue the individual investors.[13]

Creditors will be afforded the opportunity to assert claims against the Receivership if they follow the approved claim procedures that will be set forth in this case.  Whether Midland has a valid claim for deficiency will be addressed during claims settlement, provided Midland files a proper claim.  Accordingly, the court concurs that Midland's motions to lift stay are moot as to the Wellington and Tree House properties.[14]

**B.     Lubbock Town Plaza, Meridian, and Aspen Village Apartments**

In response to motions to lift stay as to the Lubbock Town Plaza, Meridian, and Aspen Village properties, the Receiver asserted the motions should be denied as moot because the Receiver intended to relinquish his interest in the three properties.[15]  Subsequently, however, the Receiver

---

[11] *See* Orders (Docket Nos. 192, 193) (authorizing relinquishment of the Receiver's interest).

[12] *See, e.g.*, Order, at 2 (Docket No. 192).

[13] Reply Memo. in Supp. of Mot. to Lift Stay, at 3 (Docket No. 216).

[14] Even though the SEC did not oppose relinquishing the Tree House property, it is contesting lifting the stay.  *See* Memo. in Opp. to Certain Noteholders' Motions to Lift Stay and for Other Relief, 2 n.1 (Docket No. 196) (citing to Docket No. 179 as a motion it opposes).  As discussed in Section III below, the court rejects the SEC's argument that Midland is not a holder in due course.  Accordingly, the court affirms that Midland may proceed with foreclosure based on the terms of the Order, dated February 5, 2009 (Docket No. 193).

[15] *See* Receiver's Memo. in Opp. to Motions to Lift Stay, 4 (Docket No. 195).

moved the court to approve agreements to sell the three properties. Due to the potential sales, the Receiver now argues these properties have value to Receivership.[16]

The financing conditions of the proposed sale agreements specify that the buyers must work out a satisfactory arrangement with the relevant Intervener to assume, continue, and/or modify the terms of the note. If the buyer and Intervener cannot agree on the terms, the proposed agreements specify the Receiver will seek an order from the court requiring the Intervener to accept the note on "such terms as the Buyers and the Receiver shall agree are reasonable under the circumstances."[17] If the stay is lifted, however, the Receiver has no such obligation under the agreements.

Under the *Wencke* factors, the proposed sales would not maintain the status quo. Indeed, if the buyers and Interveners were to be unable to agree upon satisfactory terms, the agreements propose that the court impose terms and conditions that are satisfactory to the Receiver and the buyers, without considering the Interveners' interests. This fact is troubling because the court finds, for the reasons discussed in Section III, that the Interveners have meritorious claims. Unlike the investors, the Interveners are secured creditors. "It is well-established that a 'receiver appointed by a federal court takes property subject to all liens priorities or privileges existing or accruing under the laws of the State.'"[18] Consequently, the Interveners' priority interest remains intact despite the

---

[16] The SEC also opposes lifting the stay on the three properties for the reasons discussed in Section III below.

[17] *See e.g.*, Meridian Agreement, ¶ 5 (Docket No. 248, Ex. 1).

[18] *In re Real Property Located at Jupiter Drive, Salt Lake City, Utah*, No. 2:05-cv-1013, 2007 U.S. Dist. LEXIS 65276, at *10 (D. Utah June 7, 2007) (quoting *Marshall v. New York*, 254 U.S. 380, 385 (1920)).

Receivership.[19]  Because "one debt is secured and another is not there is manifestly an inequality of rights between the secured and unsecured creditors."[20]  While this court may have broad powers to carry out the purpose of the Receivership, the court is disinclined to put the interests of the buyers and the Receivership over the interests of secured creditors.

With respect to the "timing" factor, the Receiver has had sufficient time to organize the Receivership assets and locate potential buyers for the properties.  Moreover, the buyers have had sufficient time to negotiate an agreement with the Interveners regarding satisfactory loan terms, yet, the parties have not been able to reach agreement.  Instead, the Interveners have expressly opposed the terms that have been proposed.[21]  Based on these circumstances, keeping the stay in place merely to allow more time for negotiation is not warranted.[22]  The court therefore denies the motions to approve sale agreements for the Lubbock Town Plaza, Meridian, and Aspen Village properties.[23]

Because the sale agreements are denied, they cannot be used to argue that the properties have value.  Indeed, doing so would contravene the Receiver's initial motion, which has not been withdrawn, and which represents that the Receiver will relinquish the three properties.  Based on this representation, the court concludes it is appropriate for the properties to be relinquished.  The Interveners may initiate foreclosure proceedings on such properties, subject to the same terms and

---

[19]  *See id.* at *12.

[20]  *Id.* at *10–11 (quoting *Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938)).

[21]  *See* Memos. in Opp. to proposed sale agreements (Docket Nos. 243, 259, 260, 269).

[22]  This does not mean that the potential buyers and Interveners cannot continue negotiations. It only means the stay will not be continued while such negotiations continue.

[23]  The court also denies motions to approve sale agreements related to the Westgate Villas and Casa Rio apartments for the same reasons.

conditions set forth in the Orders relinquishing the Wellington and Tree House properties.[24]

### C.      Crosby Green Apartments

In September 2008, Hurricane Ike destroyed the Crosby Green Apartments. Subsequently, the Receiver obtained $5 million from the insurer for the loss. Initially, the Receiver and Wells Fargo Bank, N.A., as Trustee for the registered holders were unable to reach agreement on how much Wells Fargo should receive to satisfy the loan. After full briefing on the issue and a hearing on the matter, the parties reached an agreement. Accordingly, by order of the court, the Receiver paid Wells Fargo $2,950,000 in full satisfaction of the loan.[25] Consequently, the motion to lift stay as to Crosby Green is moot.

## III.    INTERVENERS' STATUS AS SECURED CREDITORS

The Interveners also filed motions to lift stay for the Lubbock Square, Westgate, and Casa Rio properties (the "Remaining Properties"). Both the SEC and Receiver oppose lifting the stay on the Remaining Properties for similar reasons. They contend that the loan documentation puts the Interveners on inquiry notice that defendants were perpetrating a fraud. Because the Interveners purportedly were on inquiry notice, yet failed to conduct further investigation, the SEC and Receiver contend the Interveners have lost their rights as secured creditors. Consequently, they have no priority interest in the properties and should seek reimbursement from the Receivership in the same manners as the investors.

### A.      Illegal Contract

The Receiver contends the loan agreements pertaining to the Remaining Properties were

---

[24] *See* Orders (Feb. 5, 2009) (Docket Nos. 192, 193).

[25] *See* Order (May 6, 2009) (Docket No. 258).

illegal contracts because they were executed to carry out a Ponzi scheme.  In *Sender v. Simon*, the United States Court of Appeals for the Tenth Circuit addressed contracts in the context of a Ponzi scheme.  It stated:

> A bargain may be illegal by reason of the wrongful purpose of *one or both* of the parties making it.  This is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable.[26]

"[C]ourts generally will not enforce" an illegal contract because one who "participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction."[27]   Additionally, a seller "can, as against persons having a superior legal interest, convey only such interest as he or she has."[28]  The Receiver argues that defendants had no legal interest to convey because the contracts were illegal.  As a result, the Interveners likewise could not obtain a security interest in the properties.

It is incorrect that defendants had no legal interest to convey.  Defendants purchased properties from third-parties and thereby acquired title to the properties.  The Receiver has not contended that these transactions are void and that the property must be returned to the original owners.  Instead, the Receiver argues that the loan transactions which encumbered these properties are void because they arose from a Ponzi scheme.  While it is true the original loan transactions are

---

[26] *Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996) (emphasis added) (quotations and citations omitted).

[27] *Id.* (quotations and citations omitted).

[28] *Broadbent v. Powers*, No. 2:05cv375, 2006 U.S. Dist. LEXIS 62307, at *10 (D. Utah Aug. 29, 2006) (quotations and citations omitted).

alleged to have been part of a Ponzi scheme, this does not make the *title* itself void.[29]  Because defendants and the partnerships to which they conveyed the property had legal title to the property, such property could validly be used as collateral to secure loans.  Thus, while the original loan transactions *may* be voidable due to illegality, they are not void.

The distinction between void and voidable is significant in the context of a bona fide purchaser.  "The protections afforded to bona fide purchasers do not apply to deeds that are void."[30]  Consequently, a void deed cannot convey a legal interest, even against "'an innocent purchaser or a bona fide encumbrancer for value.'"[31]  A voidable deed, however, is "unassailable in the hands of a [bona fide purchaser]."[32]  The court has found no case addressing enforcement of a contract in the context of a Ponzi scheme that has held otherwise.  Here, because title to the Remaining Properties is not void, the Interveners could obtain a valid security interest in the properties as long as they took the interest as a bona fide purchaser for value.

### B.    Uniform Fraudulent Transfer Act

The SEC and Receiver also contend that the loan transactions are invalid based on the Uniform Fraudulent Transfer Act ("UFTA") because the property interests were transferred under a Ponzi scheme.[33]  "Under the UFTA, a debtor's actual intent to hinder, delay, or defraud is

---

[29]  Indeed, the Receiver wants to retain title of the properties in the receivership estate.

[30]  *Id.* at *9 (citations omitted).

[31]  *Id.* (quoting 23 Am Jur. 2d *Deeds* § 188 (1983)).

[32]  *Id.* (quotations and citation omitted).

[33]  Both Texas and Utah have adopted the UFTA.  Because both states have adopted the UFTA, the court does not resolve here the conflict regarding whether Texas or Utah law applies.

conclusively established by proving that the debtor operated as a Ponzi scheme."[34] "Those persons who invest on the eve of a Ponzi scheme's collapse are entities to whom the debtors became indebted when the investors entrusted their money to debtors."[35] Because "at the time debtors made transfers to earlier investors" with the actual intent to "defraud later investors, transfers to earlier investors may be fraudulent within the meaning of [the UFTA]."[36]

        1.   <u>Reasonably Equivalent Value</u>

"[A] transferee may avoid liability" under the UFTA, however, "if he or she (1) acted in good faith *and* (2) gave reasonably equivalent value in exchange for the transfer."[37] In the context of a Ponzi scheme, "the vast majority of courts . . . have held that a debtor does not receive reasonably equivalent value for any payments made to investors that represent false profits."[38] Consequently, as a matter of public policy, contracts arising from a Ponzi scheme are "unenforceable to the extent they purport[] to give [persons] a right to payments in excess of their undertaking."[39] While this rule applies to investors, the Receiver has cited no case that extends this analysis to lenders who are holders in due course. In other words, while an investor may not give reasonably equivalent value

---

[34] *Warfield v. Carnie*, No. 3:04-cv-633, 2007 U.S. Dist. LEXIS 27610, at *28 (N.D. Tex. Apr. 13, 2007) (citations omitted).

[35] *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997).

[36] *Id.*

[37] *Warfield*, 2007 U.S. Dist. LEXIS 27610, at *34 (citation omitted).

[38] *Id.* at *36 (citations omitted).

[39] *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 858 (D. Utah 1987) (*en banc*); *see also Floyd*, 209 B.R. at 433–34 (citing with approval cases from other jurisdictions that support this proposition).

in a Ponzi scheme, this does not mean that subsequent lenders also fail to give reasonably equivalent value.

Here, the Interveners were neither the investors nor the original lenders. Instead, they acquired the loans from other lenders. In doing so, they provided loan proceeds and, in turn, received a note and deed of trust on the properties. Based on this evidence, the court concludes the Interveners gave reasonably equivalent value for the note and trust deeds they hold.

### 2. Good Faith

The SEC and Receiver also contend that the Interveners did not act in good faith in the loan transactions. Good faith embodies the concept that one is free "from knowledge of circumstances which ought to put the holder on inquiry."[40] The SEC and Receiver argue that the information gathered by Trans Lending Corp. ("Trans Lending") was sufficient to put a lender on inquiry notice. Trans Lending is a loan broker that defendants retained to gather financial information and convey that information to lenders to help defendants obtain various loans. Out of approximately twenty-two transactions, Trans Lending was involved in eight or nine of them. Of these, only Westgate Villas, Lubbock Square, and Casa Rio remain at issue.[41]

### a. Westgate Villas Apartments

The Westgate Villas property loan was a full-recourse loan,[42] with Brandon Higgins as the

---

[40] *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1335 (10th Cir. 1996) (quotations and citation omitted).

[41] Trans Lending also was involved in the Sunnyview, Oakridge, Overlake, Wellington, and Aspen Village transactions. Because each of these properties have been relinquished or will be relinquished by the Receiver, the court does not address them in this analysis.

[42] Affidavit of Cecilia Bolen, ¶¶ 7, 10 (Docket No. 241) (hereinafter "Bolen Aff."). The Receiver has filed a motion to strike this affidavit because it was filed untimely. While the court

guarantor.[43]  LaSalle Bank National Association, FSB was the original lender.  Subsequently, the

note was transferred and Wells Fargo Bank N.A. became the Trustee for the registered holders.

Midland is the loan servicer and intervener on behalf of Wells Fargo.

The SEC provided an affidavit stating that Trans Lending's Westgate Villas file contained

information about "Brandon Higgins' financial condition includ[ing]:  an income and expense report,

Uniform Residential Loan Application ('Application'), income tax returns for 2003 and 2004, W-2s

from 2003 and 2004 and credit reports."[44]   A National Credit Check, also prepared for Trans

Lending, showed that Brandon Higgins had a secondary social security number.[45]  A First American

CREDCO report, prepared for LaSalle Bank National Association, stated:   "Warning: Further

verification required for detection of possible fraud."[46]  The report noted that Brandon Higgins had

address discrepancies.[47]  No other information was listed as being in the Westgate Villas file.  The

Receiver noted, however, that commingled funds were used to purchase the Westgate Villas

---

agrees that Midland's delay in filing this affidavit was inappropriate, the court's ruling does not
hinge on this affidavit.  Because there is no prejudice to the Receiver, the court denies the motion
to strike.

[43]  Midland Loan Services, Inc.'s Memo. in Supp. of Mot. to Lift Stay as to Westgate Villas
Apartments and San Angelo Westgate LP, ¶ 4 (Docket No. 178).

[44]  Declaration of Kimberlee Kennedy, ¶ 8 (Docket No. 210, Ex. 31) (hereinafter "Kennedy
Decl.").

[45]  *Id.* ¶ 33.

[46]  *Id.* ¶ 31.

[47]  *Id.* ¶ 32.

property.[48]  Further, Brandon Higgins' tax return for 2005 reported only $11,000 in adjusted gross income.[49]  Based on this information, the SEC and Receiver contend the "lender" was on inquiry notice about the fraud, and it failed to act in good faith when it did not conduct a further investigation.

The court concludes the cited information is insufficient to put Midland on inquiry notice. The "red flag" information was provided to Trans Lending and LaSalle Bank National Association. Significantly, no evidence was provided to show that Midland had such information when it acquired the note.  Merely showing information from a loan broker or an original lender's file is insufficient to prove that a holder in due course or bona fide purchaser for value took the property with knowledge about such information.

The property at issue is income producing.  As such the focus is on the property itself because it is the primary source for repayment.[50]  Neither the SEC nor the Receiver provided any information to suggest that, when Midland acquired the loan, the property had a poor loan to value ratio or insufficient revenue to service the loan.  Moreover, Midland obtained title insurance and recorded a priority deed of trust to protect its interests.[51]  While it may have been prudent for Midland to investigate more fully the background of Westgate Villas' guarantor, prudence is a different standard than failure to act in good faith.  Here, one cannot say that Midland acted in bad faith when it failed

---

[48]  *Sealed* Declaration of Alan Funk, ¶¶ 18–19, 24 (Docket Nos. 205, Ex. A; 222) (hereinafter "Funk Decl.").

[49]  *Sealed* Declaration of William J. Murray, ¶ 23 (Docket No. 205, Ex. E).

[50]  Bolen Aff. ¶ 9–10 (Docket No. 241).

[51]  *See id.* ¶ 9.

to obtain a proper guaranty due to the actions that it did undertake to ensure its loan was secured by a viable income-producing property.

b.     Lubbock Square Property

The Lubbock Square property loan was a limited-recourse loan,[52] with Allen Christensen and Brandon Higgins as the guarantors.[53]   Lehman Brothers Bank, FSB was the original lender. Subsequently, the note was transferred and LaSalle Bank National Association became the Trustee for the registered holders.  Midland is the loan servicer and intervener on behalf of LaSalle Bank.

The SEC provided an affidavit stating that Trans Lending's Lubbock Square file contained Allan Christensen's loan application, credit report, and tax returns for 2004 and 2005.[54]   It also contained Brandon Higgins' loan application.[55]   No other information for Lubbock Square is listed as being in the file.  The SEC contends this file information is significant, however, because Allan Christensen's tax returns reported negative income and the credit reports showed he had poor credit.[56]

With respect to Brandon Higgins, the SEC asserts the "lender" should have been on inquiry notice about fraud because Brandon Higgins' loan applications were inconsistent with his W2s.[57]

---

[52] *Id.* ¶ 7.

[53] Midland Loan Services, Inc.'s Memo. in Supp. of Mot. to Lift Stay as to Westgate Villas Apartments and San Angelo Westgate LP, ¶ 4 (Docket No. 178).

[54] Kennedy Decl., ¶ 9 (Docket No. 210, Ex. 31).

[55] *Id.* ¶ 10.

[56] Memo. in Opp. to Certain Noteholders' Mot. to Lift Stay and for Other Relief, ¶¶ 39–40 (Docket No. 196).

[57] *Id.* ¶ 33.

Also his later loan applications contained different information than his initial loan application. [58] While this may be correct, the Lubbock Square file did not contain this information.  Hence, it could not have raised red flags even for the original lender, much less for Midland as a subsequent holder in due course.

The Receiver provided the following additional information about the Lubbock Square transaction.  Commingled funds were used to purchase the property.[59]  The Trans Lending file contained information showing Madison purchased Lubbock Square for $5,500,000 on November 20, 2006 and sold it the same day to Lubbock Square, Texas LP for $5,900,000.  Madison was a general partner of the limited partnership.  The transaction therefore involved a double closing and possible conflict of interest arising from Madison being involved in both transactions.[60]  The Receiver also contends the file showed Richard Higgins, a convicted felon, as a "signee."[61]  No documentation was provided, however, to support this contention.

Again, information provided to a loan broker and original lender does not prove that Midland also had the same information when it acquired the note.  Moreover, Lubbock Square involved a

---

[58]  *Id.* ¶ 34.

[59]  Funk Decl., ¶¶ 18, 21 (Docket No. 205, Ex. A).

[60]  The affidavit submitted by the Receiver states the Trans Lending file contained credit reports on Brandon Higgins.  The affidavit submitted by the SEC does not support Brandon Higgins' credit reports were in the Lubbock Square file.  It is therefore unclear whether the credit reports were specifically within the Lubbock Square file or whether Trans Lending had them in another property file.

[61]  *Sealed* Memo. in Opp. to Mot. to Lift Stay as to Lubbock Square & Lubbock Square Borrowers, ¶ 20 (Docket No. 204).

limited-recourse loan.[62]   This means the lender's recourse was against the collateral itself rather than

the borrowers, unless the borrowers acted in bad faith.   Under such circumstances, it is even less

likely that a holder in due course or a bona fide purchaser for value would conduct an extensive

background check on a guarantor.

Regarding the double closing and possible conflict of interest, these events are not fraudulent

on their face.   Moreover, Trans Lending and Lehman Brothers were in a better position to address

these issues than Midland.   As noted by the United States Court of Appeals for the Seventh Circuit,

"[t]here have always been limits on the pursuit of transfers."[63]   "Initial transferees are in the best

position to monitor fraudulent transfers from the debtor."[64]   Consequently, society has placed "the

risk and burden of inquiry" on the transferor of commercial paper, rather than on the holder in due

course or bona fide purchaser.[65]   Were it otherwise, the increased costs for monitoring would shift

to the consumer "without significantly increasing the protection of creditors."[66]   Because Midland

acquired the note on the secondary market, it did not bear the same burden of inquiry, especially

since the double closing and potential conflict of interest were not fraudulent on their face.   The court

therefore concludes that Midland acted in good faith when it acquired the Lubbock Square note.

c.     Casa Rio Property

The SEC and Receiver cite to similar "red flag" information regarding the Casa Rio

---

[62]   Bolen Aff., ¶ 5–7 (Docket No. 241).

[63]   *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988).

[64]   *Rupp v. Markgraf*, 95 F.3d 936, 944 (10th Cir. 1996) (citation omitted).

[65]   *Bonded Fin. Servs., Inc.*, 838 F.2d at 892.

[66]   *Id.* at 893.

transaction.  As with the other two loan transactions, however, no information was provided to show that Fannie Mae had the "red flag" information when it acquired the loan.  Instead, Fannie Mae provided an affidavit that lists the documents in Fannie Mae's loan file.[67]   None of the "red flag" information appears on the list.  Accordingly, the SEC and Receiver have failed to show that Fannie Mae was on inquiry notice of fraud.

The Receiver further contends that Fannie Mae is an unsecured creditor on the Casa Rio loan because the loan closed approximately three minutes after the stay was entered.  The Receiver is correct that a blanket stay can bind non-parties.[68]   The stay cannot become effective against a non-party, however, until the non-party is provided with notice of the injunction.[69]  Here, Fannie Mae was a non-party at the time the stay was entered.  Consequently, it was not bound by the stay until it received notice of it.  Because Fannie Mae closed the loan transaction before it received such notice, its security interest is valid and enforceable.

### C.    HOLDER IN DUE COURSE

The SEC also contends the Interveners are unsecured creditors because they failed to take the notes as holders in due course.  "A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."[70]  As discussed above, the court has

---

[67]   Affidavit of Frank Yanez, ¶ 8 (Docket No. 213, Ex. A).

[68]   *Leberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 552 (6th Cir. 2006) (citations omitted).

[69]   *Id.*

[70]   *Fortunoff v. Triad Land Assocs.*, 906 F. Supp. 107, 113 (E.D.N.Y. 1995) (quoting U.C.C. § 3-302(1)).

concluded that the Interveners gave value for the notes and deeds of trust.  "Good faith" under the Uniform Commercial Code is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing."[71]  Regardless of whether the "red flag" information is analyzed under this definition or the one stated above for the UFTA, the outcome is the same.  No evidence has been presented that the Interveners failed to act honestly in the transactions at issue. Moreover, no evidence has been presented that the notes were overdue, dishonored, or that a defense or claim existed against them at the time they were acquired.[72]  Accordingly, the court concludes that the Interveners are holders in due course and remain as secured creditors.

## III.   RETAINING PROPERTY IN THE RECEIVERSHIP

Because the Interveners are secured creditors, to retain the Westgate Villas, Lubbock Square, and Casa Rio properties in the Receivership, the Receiver must make a strong showing that retaining the properties is necessary to fulfill the function of the Receivership and that the advantages outweigh the disadvantageous effect on the Interveners.  To the extent the Receiver can service the loans on the properties at issue and still have equity in the properties, those properties hold value to the Receivership because investors may receive compensation from the excess income.  If the value of a property is less than the loan amount, however, the disadvantages of keeping the property in the Receivership outweigh the advantages.

With respect to Casa Rio, Fannie Mae has provided evidence that the value of the property

---

[71]  U.C.C. § 1-201(20); *see also* Tex. Bus. & Com. Code § 1.201(2) (2009) (same); Utah Code Ann. § 70A-1a-201 (2009) (stating "good faith" is "honesty in fact in the conduct or transaction concerned").

[72]  The Receiver provided evidence that the Casa Rio note had to be restructured and refinanced due to delinquency.  Declaration of Receiver Roger J. McConkie, ¶¶ 10–14 (Docket No. 207).  These issues were resolved, however, before Fannie Mae acquired the note.

is less than the loan balance.[73]  The Receiver also has provided evidence regarding the property's value.[74]  While the Receiver's range in value exceeds that provided by Fannie Mae, the range is still less than the purported loan payoff amount.[75]  The court therefore concludes that the advantages of retaining Casa Rio in the Receivership do not outweigh the disadvantages to Fannie Mae, and the stay should be lifted for this property.  The same analysis applies to the Lubbock Square property.[76]  The stay is therefore lifted as to that property as well.

The Westgate Villas property presents a different picture.  Midland presented an appraisal that was done in October 2008.[77]  In that appraisal, the projected value of the property exceeded that of the loan if the property stabilized and reached an occupancy rate of 92 percent.[78]  The Receiver provided evidence that the occupancy rate has been stable since February 2009 and that the occupancy rate now exceeds 96 percent.[79]  This is sufficient to show there is equity in the property.  Because there is sufficient equity in the property, the court concludes that the advantages of keeping

---

[73] *Compare* Affidavit of Frank Yanez, ¶ 7 (Docket No. 182, Ex. B) *with Sealed* Affidavit of Dennis C. Pertle, ¶ 4 (Docket No. 194).

[74] *Sealed* Declaration of Greg Ratliff, Ex. C (Docket No. 205, Ex. F) (hereinafter "Ratliff Decl.").

[75] The court has made no determination about the actual payoff amount to which Fannie Mae is entitled.  The court merely concludes that based on the principal and interest now owing that there is little to no equity in the property.

[76] At one point, the Receiver had a formal offer on the property for an amount greater than the appraisal submitted by Midland.  That offer, however, fell through.  It therefore cannot weigh into the court's analysis about the value of the property to the Receivership.

[77] *Sealed* Affidavit of Steve Duplantis (Docket No. 244).

[78] *See id.* at vii–viii.

[79] Ratliff Decl., Ex. E, Income Approach, 3 (Docket No. 205, Ex. F).

the property in the Receivership exceed the disadvantages to Midland.  This conclusion, however, is contingent upon the Receiver restoring status quo to Midland and maintaining it.  The Receiver has not serviced the loan or paid property taxes on Westgate Villas property since the Receivership assumed control of the property.  As discussed in Section I, to justify retaining property in a receivership, one must preserve the status quo of the lender.[80]  Accordingly, the Westgate Villas property may be retained by the Receivership as long as it brings current the regular, monthly principal and interest payments that have not been paid.[81]  It must also continue to pay timely the regular, monthly principal and interest payments, as well as the property taxes, as long as the property is held by the Receivership.  If the Receiver is unable to meet these terms, the Receiver must relinquish the property and allow it to proceed to foreclosure.

## **ORDER**

For the reasons stated above, the court hereby ORDERS as follows:

1.      Motion to Modify Orders is DENIED.[82]  To the extent Midland has outstanding claims against the Receivership, those claims shall be addressed during the claims settlement phase of this litigation, provided Midland follows proper procedures in filing such claims.

2.      Motions to Approve Agreements to Sell are DENIED.[83]

---

[80] *See Wencke*, 742 F.2d at 1231 (looking at whether the status quo could be preserved under a stay).

[81]  Based on the court's broad powers under a receivership, the court reserves ruling on whether Midland is entitled to all other amounts to which it claims is due and owing.  That issue will be addressed during the claims settlement phase of this litigation.

[82]  Docket No. 50.

[83]  San Angelo Westgate, LP (Docket No. 229); San Angelo Casa Rio, LP (Docket No. 232); Lubbock Town Plaza, LP (Docket No. 234); Aspen Village property (Docket No. 236); Abilene

3.      Motion to Lift Stay as to the Wellington property is DENIED AS MOOT.[84]  Midland may initiate foreclosure proceedings, subject to the terms and conditions listed in the court's Order, dated February 5, 2009 (Docket No. 192).

4.      Motion to Lift Stay as to the Tree House property is DENIED AS MOOT.[85]  Midland may initiate foreclosure proceedings, subject to the terms and conditions listed in the court's Order, dated February 5, 2009 (Docket No. 193).

5.      Motion to Lift Stay as to the Meridian and Lubbock Town Plaza property is DENIED AS MOOT.[86]  The Receiver is ordered to relinquish these two properties from the Receivership. Crown NorthCorp may initiate foreclosure proceedings, subject to the same terms and conditions listed in the court's Order, dated February 5, 2009 (Docket No. 193), which are hereby adopted and applied to this property.

6.      Motion to Lift Stay as to Crosby Green Apartments and Crosby Green Borrowers is DENIED AS MOOT.[87]

7.      Receiver's Cross Motion for Order Directing Payment of Insurance Proceeds is DENIED AS MOOT.[88]

---

Meridian, LP (Docket No. 248).

[84]  Docket No. 49.

[85]  Docket No. 179.

[86]  Docket No. 189.

[87]  Docket No. 173.

[88]  Docket No. 202.

8.      Motion to Lift Stay as to the Aspen Village property is DENIED AS MOOT.[89]  The

Receiver is ordered to relinquish this property.  Fannie Mae may initiate foreclosure proceedings,

subject to the same terms and conditions listed in the court's Order, dated February 5, 2009 (Docket

No. 193), which are hereby adopted and applied to this property.  The preclusion of pursuing

deficiencies or the enforcement of personal guaranties extends to Matt Sefcik at this time.

9.      Motion to Lift Stay as to Casa Rio property is GRANTED.[90]  Although Fannie Mae

may initiate foreclosure proceedings, the terms and conditions listed in the court's Order, dated

February 5, 2009 (Docket No. 193), are hereby adopted and applied in full to this property.

10.     Motion to Lift Stay as to Lubbock Square property is GRANTED.[91]  Although

Midland may initiate foreclosure proceedings, the terms and conditions listed in the court's Order,

dated February 5, 2009 (Docket No. 193), are hereby adopted and applied in full to this property.

11.     Motion to Lift Stay as to Westgate Villas property is DENIED.[92]  This denial is

contingent upon the Receiver bringing current the regular, monthly principal and interest payments

that have not been paid.  It must also continue to pay timely the regular, monthly principal and

interest payments, as well as the property taxes, as long as the property is held in the Receivership.

If the Receiver is unable to meet these terms, the Receiver is ordered to relinquish the property and

allow it to proceed to foreclosure.  Should relinquishment be necessary, the same terms and

conditions listed in the court's Order, dated February 5, 2009 (Docket No. 193), shall apply to this

---

[89]  Docket No. 181.

[90]  Docket No. 181.

[91]  Docket No. 175.

[92]  Docket No. 177.

property as well.

      12.     Motion to Strike Affidavit of Cecilia Bolen is DENIED.[93]

DATED this 13th day of August, 2009.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[93] Docket No. 245.